68 F.3d 382
 Fed. Sec. L. Rep. P 98,919
James H. CONNETT, Plaintiff-Appellant,
v.
JUSTUS ENTERPRISES OF KANSAS, INC., aka Justus
Cylinder-Technology, Inc.; Justus Cylinder-Technology,
Inc.; Ranson & Company, Inc.; Mid Continent Municipal
Investments, Inc.; B.C. Christopher Securities Co.; J.O.
Davidson & Associates, Inc.; R.G. Dickinson & Co.; Carlos
Taylor, Defendants-Appellees.
 No. 94-3298.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 5, 1995.
 
 Frank C. McMaster of McMaster & McMaster, and Thomas A. Wood, Wichita, Kansas, for Plaintiff-Appellant.
 Robert J. O'Connor and David E. Bengston of Morrison & Hecker, Wichita, Kansas, for Defendants-Appellees.
 Before HENRY and LOGAN, Circuit Judges, and ELLISON, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiff James H. Connett appeals from a district court judgment entered in favor of defendants Ranson and Co., Inc., Mid-Continent Municipal Investments, Inc., J.O. Davidson & Assoc., Inc. and R.G. Dickinson & Co. (collectively defendants or the bond sellers). The suit alleged violation of Sec. 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78j, as well as common law fraud under Kansas law in connection with the sale of industrial revenue bonds issued by the City of Chanute, Kansas. On appeal plaintiff asserts that the district court erred in granting defendants' motion for judgment as a matter of law at the close of plaintiff's evidence. Plaintiff contends that he presented a legally sufficient case to require submission to the jury of the issue whether the Official Statement prepared in connection with the bond offering omitted material information rendering it misleading under Rule 10b-5.[1]
 
 
 2
 * Justus Enterprises of Kansas, Inc. was incorporated specifically to acquire the assets of Cylinder Technology, Inc. (CTI) and to operate its business. The purchase price for the five acres of land, two buildings, machinery and equipment of CTI, a manufacturer of high-pressure cylinders, was $3,924,000. The City of Chanute issued $6.6 million of industrial revenue bonds to fund the acquisition, to purchase additional machinery and building improvements, to create a bond reserve and an escrow of the first six months interest, and to pay the bond issuance expense. The city took title and leased the assets to Justus Enterprises pursuant to a typical industrial revenue bond lease-purchase agreement. The security for the payment of the bonds was the lease, the acquired assets, and the personal guarantees of Justus Enterprises and Walter G. Justus.
 
 
 3
 Justus Enterprises defaulted on the bonds and Walter Justus filed for bankruptcy. When a liquidation sale of the company properties brought in less than $400,000, plaintiff filed suit individually and as a class representative for the bond purchasers (excluding the defendants). The district court certified plaintiff as class representative for purchasers in the initial bond offering.[2] Plaintiff alleged, inter alia, that the bond sellers committed fraud by failing to disclose certain appraisal information.[3]
 
 
 4
 The omitted information appears in various appraisal documents generated by American Appraisers (American). In 1982, American made a fair market value appraisal of the assets of C.J.B. Industries, Inc., in Chanute, Kansas, for CTI when CTI purchased those assets. In August 1983 American made a $1.5 million "orderly liquidation value" appraisal of the assets at CTI's request. American also provided CTI with a fair market value appraisal in September 1983. Correspondence followed between American, bond counsel, and Ranson regarding what information from American's appraisals would be included in documents generated in connection with the industrial revenue bond issue. The Official Statement that plaintiff argues is misleading was dated October 31, 1983.
 
 
 5
 The Official Statement contained a "Description of Project" reading as follows:
 
 
 6
 Bond proceeds will be used to acquire approximately five acres of land, two connected multi-purpose buildings totaling 77,000 square feet, and machinery and equipment owned by Cylinder Technology, Inc. ("CTI") in Chanute, Kansas. The total appraised value of the acquired assets, including those not acquired out of bond proceeds, as determined by its "fair market value in continued use" based on an appraisal, as of May 31, 1982, by a nationally known independent appraisal company, was in excess of $11,000,000. The Tenant [Justus Enterprises] is expected to pay approximately $180,000 for additional assets of CTI and new machery [sic] and equipment, and to pay $105,000 for organizational and acquisitional expenses from Tenant's own funds.
 
 
 7
 App. 93. The omitted information falls into two categories. One was the "orderly liquidation value" of the assets from American's August 1983 appraisal letter. See id. at 75-77. The other category includes the underlying assumptions for the "in continued use" appraisal from American's September 1983 appraisal letter. See id. at 81-83. The only appraisal figure included in the Official Statement was the single agreed-upon reference to the "fair market value in continued use." Id. at 84, 93; Supp.App. 84.
 
 
 8
 At the close of plaintiff's evidence during a jury trial, the district court granted the bond sellers' Fed.R.Civ.P. 50(a) motion for judgment as a matter of law. The district court found that plaintiff made "no showing that the [bond sellers] knowingly made false or misleading representations or omissions of material facts in connection with the sale of the bonds." App. 58.
 
 
 9
 We review a district court order disposing of a Rule 50 motion de novo, construing the evidence and making reasonable inferences most favorable to the nonmoving party. Pegasus Helicopters, Inc. v. United Technologies Corp., 35 F.3d 507, 510 (10th Cir.1994). Our analysis necessarily examines the materiality of the omitted information. Materiality is a mixed question of law and fact. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). "Although generally more a factual question under the mixed standard of review, the question of materiality is to be resolved as a matter of law when the information is 'so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality.' " Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir.1991) (quoting TSC Indus., Inc., 426 U.S. at 450, 96 S.Ct. at 2133 (citations omitted)).
 
 II
 
 10
 We first address the legal standard for a material nondisclosure under Sec. 10(b)[4] and Rule 10b-5 promulgated under that statute. Rule 10b-5 provides in pertinent part that
 
 
 11
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 12
 . . . . .
 
 
 13
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, ... in connection with the purchase or sale of any security.
 
 
 14
 17 C.F.R. Sec. 240.10b-5.
 
 
 15
 Liability for failure to disclose only arises when the duty to disclose exists and the withheld information is material. Affiliated Ute Citizens v. United States, 406 U.S. 128, 152-54, 92 S.Ct. 1456, 1471-72, 31 L.Ed.2d 741; see also Chiarella v. United States, 445 U.S. 222, 227-29, 100 S.Ct. 1108, 1114-15, 63 L.Ed.2d 348 (1980); Jensen v. Kimble, 1 F.3d 1073, 1077 (10th Cir.1993) (in order to be actionable, an omission must render misleading the affirmative statements actually made). Although the Supreme Court has defined materiality in terms of importance to investors, it has also explained that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); see also Basic Inc. v. Levinson, 485 U.S. 224, 238, 108 S.Ct. 978, 986-87, 99 L.Ed.2d 194 (1988) (expressly adopting the TSC Industries standard of materiality for Sec. 10(b) and Rule 10b-5). Thus we must evaluate the omissions in light of all the information included in the Official Statement, to determine if it would have affected that mix. 426 U.S. at 449, 96 S.Ct. at 2132; see also Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir.1991).
 
 III
 
 16
 * Plaintiff asserts that the omission of the "orderly liquidation value" appraisal from the Official Statement misleads investors to conclude that the assets purchased with bond proceeds are sufficiently valuable to avoid a loss. This argument ignores the evidence in the record.
 
 
 17
 The appraisal value of over $11,000,000 in the Official Statement is qualified as being the "fair market value in continued use" and is set off with quotation marks. The Official Statement states in more than one place that the land, buildings and equipment were to be purchased for approximately $3.9 million. The discrepancy between the price paid for CTI's assets and the "in continued use" appraisal is referred to "in the opinion of management ... as unrecorded equity due to the favorable negotiated purchase price." App. 120. As the district court pointed out,
 
 
 18
 The suggestion that the investors were falsely led to believe that the property "would be adequate to prevent loss" if the business failed is a thinly veiled assertion that investors interpreted the assets' "fair market value in continued use" to mean the amount of money that piecemeal forced disposition of the assets would bring upon failure of the business. No reasonable investor could interpret the defendants' representation in this manner. By its very terms, the value of assets "in continued use" is antithetical to the value of the assets upon disposition after failure of the business. It was thus implicit in the language used in the Official Statement that an appraisal of the value of the assets "in continued use" was measuring something different from the value of the assets upon liquidation of the business. The terms used in the Official Statement cannot reasonably be taken as a representation that investors would not lose their investment if the business failed.
 
 
 19
 Id. at 68-69.
 
 
 20
 The Official Statement also contained disclaimers and stated in bold type that the foregoing statements regarding "certain risks associated with the offering should not be considered as a complete description of all risks to be considered in the decision to purchase the bonds." Id. at 92. It warned investors that CTI's assets might not be free of creditors' claims, that CTI lacked working capital, that Justus Enterprises' new president was a "Turnaround Specialist," id. at 120, and that bondholders could suffer a loss "if the assets of the tenant and guarantor are insufficient to enable them to perform in full." Id. at 92. Taken together, these statements would lead reasonable investors to conclude that they risked losing their money if Justus Enterprises failed to turn the business around.
 
 
 21
 Plaintiff points to the district court's statement that the "orderly liquidation value" would likely be important information to a reasonable investor as demonstrating that the district court applied the wrong legal standard. Read in isolation, this might appear to be so. A reading of the entire opinion, however, reveals that the district court considered all of plaintiff's evidence and discussed specific disclosures that communicated risks to bond purchasers, including that CTI was in a "troubled financial condition." Id. at 56. We agree with the district court that the omission of the "orderly liquidation value" appraisal did not render the Official Statement misleading.
 
 B
 
 22
 Plaintiff next alleges that the omission of three assumptions upon which the "in continued use" appraisal was based rendered misleading the actual representations in the Official Statement; that the omission of these assumptions would lead investors to conclude that a liquidation of assets would protect against a loss.
 
 
 23
 The statements plaintiff asserts were improperly omitted from the Official Statement appear in American's September 1983 appraisal report and read as follows:
 
 
 24
 Fair Market Value is defined as the estimated amount at which the property might be expected to exchange between a willing buyer and a willing seller, neither being under compulsion, each having reasonable knowledge of all relevant facts, with equity to both, and with buyer and seller contemplating the retention of the facilities at their present location for continuation of the current operations.
 
 
 25
 ....
 
 
 26
 We did not investigate any financial data pertaining to the present or prospective earning capacity of the operation in which the designated property is used. Our opinion of fair market value assumes that the prospective earnings will provide an [sic] fair return on the appraised value of the assets included in the appraisal, as well as assets not part of the appraisal, if any, and adequate net working capital.
 
 
 27
 ....
 
 
 28
 The appraised fair market value stated above is not intended to represent the amount that might be realized from disposition of the property in the open market for any alternate applicable use.
 
 
 29
 App. 81-83.
 
 
 30
 The first and third statements are similar in substance; they refine the meaning of the "fair market value in continued use." The Official Statement includes the "in continued use" qualifier and states that the bond proceeds are earmarked to purchase CTI's assets.[5] We agree with the district court that a reasonable investor would conclude the "in continued use" appraisal assumes a viable business operation and does not include a sale of those business assets for another purpose. We agree that disclosing these two assumptions is not necessary to prevent the Official Statement from being misleading.
 
 
 31
 Plaintiff asserts that the other omitted assumption, of a "fair return on the appraised value of the assets" and "adequate net working capital," should have been disclosed because they were lacking in CTI's operation which had not enjoyed financial success. However, bond purchasers were informed of the disparity between the purchase price and the "in continued use" appraisal, that the appraisal information was a summary of other available documents, and that Justus Enterprises sought to "turnaround" CTI's business operations. The message repeated throughout the Official Statement was that Justus Enterprises purchased an unprofitable business and that a variety of risks were inherent in the bond issue. CTI lacked adequate working capital and evidently did not generate a "fair return" because it was in a "troubled financial condition." App. 56.
 
 
 32
 The assumptions of a "fair return" and "adequate net working capital" are consistent with the concept of "fair market value in continued use" of CTI's assets. Plaintiff did not introduce evidence that the "in continued use" appraisal was inconsistent with standard accounting or appraisal practice, or that these assumptions were improper bases upon which to build such an appraisal. Reasonable investors might not agree on a precise definition of an "in continued use" appraisal, but the term logically precludes a business lacking adequate working capital and unable to provide a fair return. Investors were told about CTI's financial problems and the disparity in the purchase price. The reasonable investor would be placed on notice that the "in continued use" appraisal necessarily assumed adequate working capital and a fair return on the invested assets in an ongoing business.
 
 
 33
 Omitting the paragraphs complained of from the Official Statement did not "significantly alter[ ] the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting TSC Indus., 426 U.S. at 449, 96 S.Ct. at 2132). Thus, we agree with the district court that omitting these assumptions did not render misleading the appraisal information actually disclosed, and no reasonable jury could conclude otherwise.
 
 
 34
 AFFIRMED.
 
 
 
 *
 The Honorable James O. Ellison, Senior United States District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument
 
 
 [2]
 Before trial, all defendants except the bond sellers who are a party to this appeal were either dismissed or settled their claims. See App. 59
 
 
 [3]
 Plaintiff evidently concedes that his claim is based only upon omissions in the Official Statement; he does not challenge the accuracy of the information that was disclosed to potential investors
 
 
 [4]
 That section, 15 U.S.C. Sec. 78j, reads as follows:
 Manipulative and deceptive devices
 It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [5]
 The Official Statement specifically encourages prospective investors to analyze "additional information in the form of the complete documents summarized herein." App. 92. Those documents were available by contacting Ranson & Co., Inc. whose address and telephone number appear in the Official Statement. See id